FILED

2016 Sep-30  PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KRYSTI GRIFFITH** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:14-cv-02330-MHH** |
| | } | |
| | } | |
| **NICHOLAS FINANCIAL, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Plaintiff Krysti Griffith is a former employee of defendant Nicholas Financial, Inc.  Ms. Griffith has systematic lupus erythematosus, an autoimmune disease commonly called lupus.  Ms. Griffith worked for Nicholas Financial as a customer service representative in Nicholas Financial's Huntsville, Alabama office.  Ms. Griffith last worked for Nicholas Financial on January 30, 2014.  Plaintiff Ms. Griffith claims that Nicholas Financial terminated her employment because the company did not want to accommodate the complications of her lupus.  Nicholas Financial maintains that Ms. Griffith's employment ended because of her insubordination and poor attitude.  In this lawsuit, Ms. Griffith asserts claims against Nicholas Financial under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*  Pursuant to Federal Rule of Civil Procedure 56, Nicholas Financial

asks the Court to enter judgment in its favor on Ms. Griffith's ADA claim. (Doc. 22). For the reasons stated below, the Court denies the motion for summary judgment.

## I.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the facts in this opinion in the light most favorable to Ms. Griffith. *See White*, 789 F.3d at 1191; *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the

facts evidenced by the parties, [courts] must credit the nonmoving party's version.").

## II.    FACTUAL BACKGROUND

Ms. Griffith worked for Nicholas Financial for nearly two years. (Doc. 1, ¶¶ 7–8; 38–40). In fact, Ms. Griffith was the longest-serving employee at Nicholas Financial's Huntsville branch. (Doc. 20-5, p. 29). Jerry Hudgins, Regional Vice President at Nicholas Financial, regarded Ms. Griffith as "a benefit to the team," (*see* doc. 20-7, p. 6), and two months before Ms. Griffith's last day at Nicholas Financial, Mr. Hudgins told Ms. Griffith that she performed "great" for the company. (Doc. 20-2, p. 26). In addition, Susan Burek, Director of Human Resources at Nicholas Financial, acknowledged that Ms. Griffith had been "extremely loyal to the branch." (Doc. 20-7, p. 9).

As a customer service representative, Ms. Griffith handled delinquent customer accounts; completed state audits and other reports; filed documents; interviewed and approved customers; interacted with dealers; and opened and closed the Huntsville office. (Doc. 20-1, p. 13; Doc. 20-2, p. 19). According to Ms. Griffith, she "loved [her] job" at Nicholas Financial, and she "would [have] never quit there." (Doc. 20-3, p. 5).

Ms. Griffith contends that Nicholas Financial forced her to leave her job because of her lupus. Lupus is a systematic autoimmune disorder that affects the

central nervous system and is incurable.[1]  Lupus is unpredictable; it has periods of

dormancy and periods of flare.  During a temporary flare, lupus may cause fever,

weakness, mouth sores, headaches, migraines, body aches, fatigue, skin lesions,

and inflammation.  (*See* Doc. 20-1, p. 11).  Exposure to ultraviolet or fluorescent

lighting, sunlight, and stress can trigger a lupus flare for Ms. Griffith.  (Doc. 20-1,

p. 12).  Ms. Griffith's co-workers at Nicholas Financial knew that she suffers from

lupus.  (*See*, *e.g.*, Doc. 20-1, p. 17;  Doc. 20-3, p. 14–15).[2]

Branch manager Stuart Whitaker learned that Ms. Griffith had lupus soon

after he joined Nicholas Financial.  (Doc. 20-3, p. 14).  Nicholas Financial hired

Mr. Whitaker on October 28, 2013.  (Doc. 20-3, p. 12).  During his first week on

the job, when Mr. Whitaker tried to replace a fluorescent light above Ms. Griffith's

---

[1] Systemic lupus erythematosus is defined as:

a chronic, remitting, relapsing, inflammatory, and often febrile multisystemic disorder of connective tissue, acute or insidious in onset, characterized principally by involvement of the skin, joints, kidneys, and serosal membranes. It is of unknown etiology, but it is thought to represent a failure of the regulatory mechanisms of the autoimmune system that sustain self-tolerance and prevent the body from attacking its own cells. . . . The disorder is marked by a wide variety of abnormalities, including arthritis and arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia . . . .

The Sloane–Dorland Annotated Medical–Legal Dictionary 330 (1992 supp.).

[2] On a few occasions, Ms. Griffith's coworkers made statements that she attributed to her lupus. For example, one day when she was sick, Mr. Hudgins stated to her that she "sounded like [she] was dying, and . . . should go to the hospital and get checked out."  (Doc. 20-1, p. 19).  On another occasion, Brandi Adams, District Manager at Nicholas Financial, asked Ms. Griffith, "How can [you] eat so much food and be skinny?"  (Doc. 20-1, p. 18).  Finally, Stuart Whitaker, Huntsville Branch Manager at Nicholas Financial, told Ms. Griffith in his first week of work he had a relative who had lupus.  (Doc. 20-1, p. 18;  Doc. 20-3, p. 14).

desk, Ms. Griffith instructed him not to repair the broken light because she feared that she could have a lupus flare as a result of exposure to fluorescent lighting. (Doc. 20-1, p. 16–17;  Doc. 20-3, p. 14).  She explained to Mr. Whitaker that dimly-lit conditions were "better for [her] because" of her "lupus."[3]  (Doc. 20-1, p. 16–17; Doc. 20-3, p. 14).  Mr. Whitaker acknowledges that Ms. Griffith told him that "brightness . . . bother[ed] her."  (Doc. 20- 3, p.14).  Ms. Griffith asserts that Mr. Whitaker asked how often she had lupus flares; she responded that her lupus flares were also triggered by stress.  (Doc. 20-1, p. 40;  Doc. 20-2, p. 53).  Mr. Whitaker did not replace the light above Ms. Griffith's desk, and she worked in a dim workspace until late December 2013.  (Doc. 20-1, p. 17).

Before Mr. Whitaker joined Nicholas Financial, Mr. Hudgins had considered promoting Ms. Griffith to assistant branch manager at Nicholas Financial's Huntsville location.  (Doc. 20-2, pp. 16, 22; Doc. 20-7, p. 5).  Just after Mr. Whitaker became branch manager, Mr. Hudgins directed Mr. Whitaker to give Ms. Griffith "a working interview" for the promotion.  (Doc. 20-2, p. 22).  According to Ms. Griffith, Mr. Hudgins stated to her that she could "totally get promoted," and that he had "no issue" with it.  (Doc. 20-1, p. 21; Doc. 20-2, p. 22).  To demonstrate her ability, Ms. Griffith wanted to conduct face-to-face meetings with

---

[3] Given her sensitivity to light due to lupus, Ms. Griffith also testified that her car "windows have to be tinted," *see* doc. 20-1, p. 12;  that she has to wear prescription sunglasses, *see* doc. 20-1, p.25;  and, that she gets dressed at home in the dark, *see* doc. 20-1, p. 25.

clients "to drum up new business."  (Doc. 20-3, p. 13; Doc. 20-1, p. 20).  Ms. Griffith maintains that Mr. Whitaker denied her opportunities to show that she was qualified for a promotion.  (Doc. 20-3, p. 13; Doc. 20-1, p. 20).  In fact, according to Ms. Griffith, in early November 2013, Mr. Whitaker informed her that he had already made plans to hire someone else as assistant branch manager.  (Doc. 20-1, p. 23).  As a result, Ms. Griffith emailed Mr. Hudgins and withdrew her interest in the position.  (Doc. 20-2, p. 26).  Ms. Griffith did not feel that she would "have a fair chance at proving [herself]."  (Doc. 20-2, p. 26).

In the weeks that followed, Mr. Whitaker felt that Ms. Griffith's attitude "turned sour."  (Doc. 20-3, pp. 12–13).  Mr. Whitaker and Brandi Adams, the Nicholas Financial district manager who supervised Mr. Whitaker, testified that they had to have conversations with Ms. Griffith about her attitude.  (Doc. 20-3, pp. 17–22; Doc. 20-4, p. 14; Doc. 20-7, pp. 7–13). During one conversation in which Mr. Whitaker reprimanded Ms. Griffith for her attitude, Mr. Whitaker "followed [her] outside" and "yell[ed] at [her]."  (Doc. 20-1, p. 23).

In late December 2013, Nicholas Financial hired Johnny Latapie to serve as the assistant branch manager at the Huntsville location.  (Doc. 20-3, pp. 13–14). To make room for Mr. Latapie, Mr. Whitaker asked Ms. Griffith to move to a new desk in the front of the office.  (Doc. 20-3, p. 14).  Ms. Griffith alleges that she informed Mr. Whitaker that she did not want to move to the front of the office

because she worried that the sunlight that the front desk received would set off a lupus flare.  (Doc. 20-1, p. 24).

Ms. Griffith contacted Human Resources at Nicholas Financial to complain about the move, explaining that transitioning to a desk surrounded by sunlight "[is] going to cause a flare-up with the lupus."  (Doc. 20-1, p. 25–26).  Mr. Whitaker maintains that he asked Ms. Griffith to move because he "need[ed] to have [his] Assistant Manager in training next to [him]."  (Doc. 20-7, p. 11).  Ms. Griffith testified that Ms. Adams was "mad at [her] because [she had] called [Human Resources]," and that Ms. Adams instructed Ms. Griffith never to "call anybody other than her" with complaints.  (Doc. 20-1, p. 26).  Ultimately, Mr. Whitaker told Ms. Griffith, "It's not up to [you]"—"[your] desk [will] be moved."  (Doc. 20-1, p. 25).  Ms. Griffith complied with Mr. Whitaker's orders.  (Doc. 20-1, p. 25).

On January 14, 2014, Mr. Whitaker evaluated Ms. Griffith's work performance. (Doc. 20-1, p. 30; Doc. 20-2, pp. 32–38).  The evaluation scale is as follows:

> 5: Job performance is far beyond expectations
> 4: Job performance exceeds expectations
> 3: Job performance meets expectations
> 2: Job performance is below expectations
> 1: Job performance is unacceptable

(Doc. 20-2, p. 32).  The performance review is divided into seven broad categories and sixty-one sub-categories.  (Doc. 20-2, p. 32).  These categories include attitude; acceptance of constructive criticism; interactions with dealers, customers,

and coworkers; and communication of problems to staff and management.  (Doc. 20-4, pp. 34–40).  Ms. Griffith received an overall average score of "4.667."  (Doc. 20-2, pp. 32–38).  Mr. Whitaker gave Ms. Griffith ten 3s; twenty-two 4s; twenty-eight 5s; and one "N/A."  (Doc. 20-2, pp. 32–38).  Ms. Griffith received no unacceptable ratings.  (Doc. 20-3, p. 19).  Mr. Whitaker testified that he was aware of the performance evaluation scale when he assessed Ms. Griffith's performance.  (Doc. 20-3, p. 19).  According to Mr. Whitaker, when he and Ms. Adams debriefed about Ms. Griffith's evaluation, Ms. Adams told him that he was "spot on with everything."  (Doc. 20-3, p. 20).  Ms. Adams corroborated Mr. Whitaker's testimony.  (Doc. 20-4, p. 15). [4]

On January 20 and 21, 2014, roughly two weeks after Mr. Whitaker made Ms. Griffith move to a new desk that exposed her to sunlight, Ms. Griffith missed work because she had a lupus flare.  (Doc. 20-1, p. 31–34; Doc. 20-2, p. 41).  Ms. Griffith attributed the lupus flare to the sunlight exposure at the new desk.  (Doc. 20-1, pp. 31–32).  Ms. Griffith returned to work with a doctor's excuse and maintains that she informed Mr. Whitaker that she was absent because of a lupus flare.  (Doc. 20-1, p. 31; Doc. 20-2, p. 41).  According to Ms. Griffith, Mr. Whitaker advised her that she "[i]n general . . . couldn't have absences" and "had to be [at work] every day."  (Doc. 20-1, p. 32).

---

[4] When questioned about why Ms. Griffith's review was good if her performance was poor, Ms. Adams replied, "That's not a good review."  (Doc. 20-4, p. 17).

On January 29, 2014, one week following Ms. Griffith's disability-related absences, Mr. Whitaker made Ms. Griffith work outside of the branch; she made field calls all day.  (Doc. 26, ¶ 4).  According to Ms. Griffith, she had never made field calls for more than a couple of hours on a given day.  (Doc. 20-1, p. 24).  Therefore, she found it "unusual . . . to [make such calls] all day."  (Doc. 26-1, ¶ 4).

While Ms. Griffith made field calls, Mr. Whitaker interviewed candidates to replace her.  (Doc. 20-3, pp. 26–27).  According to Ms. Adams and Mr. Whitaker, they thought that Ms. Griffith may quit because she seemed unhappy, and they knew that the Huntsville branch needed a customer service representative.  (Doc. 20-3, p. 26; Doc. 20-4, p. 17).  But Ms. Adams testified that Ms. Griffith "always" said that she was "happy" at Nicholas Financial, and Ms. Adams admitted that Ms. Griffith never said to her, "I'm not happy about this, or I'm not happy about that." (Doc. 20-4, p. 17).  Mr. Hudgins—who oversees 34 branches in nine states—does not recall another occasion where Nicholas Financial interviewed candidates for a position based on a suspicion that the sitting employee might resign.  (Doc. 20-5, pp. 4–8).

While Ms. Griffith was out of the branch conducting field calls, she spoke with Marissa Bootes, administrative assistant at the Nicholas Financial Huntsville branch.  (Doc. 20-1, p. 36).  Ms. Bootes told Ms. Griffith about the interviews.

(Doc. 20-1, p. 36).  Ms. Griffith maintains that Ms. Bootes told her that one of the interviewees said that he was interviewing for Ms. Griffith's position.  (Doc. 20-1, p. 36).  When Ms. Griffith returned to the branch later that afternoon, she reviewed an e-mail that Mr. Hudgins had sent to branch employees alerting them that, among other things, he was unable to participate in interviews at the Huntsville branch because of inclement weather.  (Doc. 20-2, pp. 48–49; Doc. 20-1, p. 35).  After reading that e-mail, Ms. Griffith e-mailed Ms. Adams and asked whether the Huntsville branch was hiring a new employee.  (Doc. 20-1, p. 35;  Doc. 20-2, p. 51).  Ms. Adams did not reply to Ms. Griffith's e-mail.  (Doc. 20-1, p. 35).

On the same day, after Ms. Griffith e-mailed Ms. Adams, Ms. Griffith asserts that Ms. Adams called the branch to speak with Mr. Whitaker.  (Doc. 20-1, p. 41).  Ms. Griffith claims that she knew that Ms. Adams was calling because she recognized Ms. Adams's telephone number on the "caller ID."  (Doc. 20-1, p. 41).  Ms. Griffith testified that she heard Mr. Whitaker say to Ms. Adams, "Not yet, but I will before I leave."  (Doc. 20-1, p. 41).  Before Mr. Whitaker left the branch for the day, he gave Ms. Griffith a negative job performance review—just two weeks after her favorable job performance review, and one week after her lupus flare.  (Doc. 20-1, p. 32; Doc. 20-4, pp. 41–42).  According to the new evaluation, Ms. Griffith's work was inconsistent, lacked urgency, and needed to improve in certain areas.  (Doc. 20-4, p. 41–42).  Ms. Griffith, who claims that Mr. Whitaker did not

explain the unfavorable review to her, states that Mr. Whitaker "basically [said to her that she] wasn't doing [her] job."  (Doc. 20-1, p. 32).  Given that she had obtained a positive job performance evaluation just two weeks earlier, and in light of Mr. Whitaker conducting interviews to replace her, Ms. Griffith felt that the review "was completely unfounded" and that she had "been falsely written up." (Doc. 20-1, p. 32–37; Doc. 20-2, p. 53).  Later that evening, when she went home, Ms. Griffith wrote a five-page response to the negative evaluation.  (Doc. 20-1, p. 37).

On the next morning, January 30, 2014, Ms. Griffith brought her response to the unfavorable job review with her to work.  (Doc. 20-1, p. 33;  Doc. 20-2, p. 43–47).  Ms. Griffith asserts that she presented her response to Mr. Whitaker and attempted to fax it to Human Resources, but Mr. Whitaker stopped her.  (Doc. 20-1, p. 35–37).  Ms. Griffith also alleges that she wanted to call Mr. Hudgins to discuss the bad review, but Mr. Whitaker again did not permit her to do that.  (Doc. 20-1, p. 37–41).

According to Ms. Griffith, Ms. Adams called her later that morning and scolded her for not greeting Mr. Whitaker earlier that morning and for having a "bad attitude."  (Doc. 20-1, p. 40).  Ms. Griffith maintains that Ms. Adams then

commanded her to "get [her] shit and leave." (Doc. 20-1, p. 40). [5]  Ms. Griffith

agreed; said "Okay. Thank you"; and then ended the call. (Doc. 20-1, p. 41). Ms.

Griffith maintains that she did not hang up on Ms. Adams or interrupt her. (Doc.

20-1, p. 40). Ms. Griffith understood that, as district manager, Ms. Adams had

authority to terminate her, because Ms. Adams's predecessor had hired and fired

branch employees. (Doc. 26, ¶ 5). Ms. Bootes, Ms. Griffith's co-employee,

"assume[d that] [Ms. Griffith] got fired." (Doc. 20-6, p. 38).

Ms. Griffith followed Ms. Adams's directives: she packed her belongings

and left the branch, reasoning that she had just been terminated. (Doc. 20-1, p.

41). [6]  Before Ms. Adams had called Ms. Griffith, she testified that she had

arranged a second interview with Anthony Fields for Ms. Griffith's position. (Doc.

20-4, p. 25). Moreover, Mr. Whitaker had asked Human Resources to check Mr.

Fields's background and credit history before Ms. Griffith arrived at the office on

the morning of January 30, 2014. (Doc. 20-3, p. 32; Doc. 20-4, p. 57)

Ms. Griffith testified that after she left the branch on January 30, 2014, she

called Mr. Hudgins, but he did not answer. (Doc. 26-1, ¶ 6). Ms. Griffith then

---

[5] In her EEOC charge and complaint, Ms. Griffith asserts that Ms. Adams said "to get my belongings and leave." (Doc. 1, p.5; Doc. 20-2, p. 53). However, Ms. Griffith testified that Ms. Adams told her "to get my shit and leave," and "to get my stuff and leave." (Doc. 20-1, pp. 40–41). For purposes of this opinion, the Court does not find a material difference among the three variations of Ms. Adams's alleged statements and finds that each of them communicates the same message.

[6] Nicholas Financial contends that Ms. Griffith threw and dumped files, and then "peeled" out of the parking lot. (Doc. 20-1, p. 38).

called Human Resources to report that Ms. Adams had discharged her.  (Doc. 20-1, p. 41; Doc. 20-6, p. 6).  Ms. Griffith asked that her final pay check be separated from other monies that Nicholas Financial owed her.  (Doc. 20-1, pp. 42–43).  Ms. Griffith maintains that she explained that Mr. Whitaker had given her a positive performance review with no unfavorable ratings; then, just two weeks later, given her a negative performance review; and finally, had her work outside of the office so that he could interview people to replace her.  (Doc. 20-6, p. 6).  According to Ms. Griffith, when she asked how long her termination had been planned, Human Resources employee Susan Ms. Burek responded that "she was not at liberty to discuss that."  (Doc. 26-1, ¶ 6).  Finally, Ms. Griffith asserts that when she asked Ms. Burek when she would lose her medical insurance, Ms. Burek responded that "it would be terminated the next day."  (Doc. 26-1, ¶ 6; Doc. 20-1, p. 42).

On February 10, 2014, Nicholas Financial hired Anthony Fields to replace Ms. Griffith.  (Doc. 20-3, p. 40).[7]  Sometime thereafter, Ms. Griffith filed an application for unemployment.  (Doc. 20-1, p. 41).  Nicholas Financial informed the Alabama Department of Labor that Ms. Griffith's separation of employment was due to "lack of work."  (Doc. 20-6, p. 21).  Nicholas Financial did not report

---

[7] The record does not indicate whether Mr. Fields was disabled.

that Ms. Griffith had "voluntary[il]y quit." (Doc. 20-6, p. 21).[8] According to Nicholas Financial, it had considered inviting Ms. Griffith back to her job, but, ultimately, the company felt that her insubordination, poor attitude, and behavior foreclosed that possibility. (Doc. 20-5, pp. 20–22).

## III. ANALYSIS

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees [or] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove that she was subjected to unlawful discrimination because of her disability, a plaintiff may rely on either direct evidence of discrimination or circumstantial evidence of discrimination. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). Ms. Griffith pursues her discrimination claim on the basis of circumstantial evidence. Therefore, to analyze Ms. Griffith's ADA claim, the Court must employ the burden-shifting analysis that the United States Supreme Court described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Anderson v. Embarq/Sprint*, 379 Fed. Appx. 924, 927 (11th Cir. 2010).

---

[8] Nicholas Financial alleges that it indicated to the Alabama Department of Labor that Ms. Griffith's separation of employment was due to "laid off/lack of work" because "although [Ms. Griffith had] handled things poorly that final day, [Nicholas Financial] felt that she had done some good for us in the past, and we felt that she should get the unemployment." (Doc. 20-6, p. 8).

To fulfill the first step of the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of discrimination by showing that she (1) is disabled, (2) is a "qualified individual" who is able to perform the "essential functions" of the job, "with or without reasonable accommodation"; and (3) was subjected to an adverse employment action because of unlawful discrimination based on her disability. *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *see also Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255–56 (11th Cir. 2007). This initial proof establishes a rebuttable presumption that the employer acted illegally. *McDonnell Douglas*, 411 U.S. at 802. After a plaintiff establishes a *prima facie* case of discrimination, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets this burden, then the burden shifts back to the plaintiff to "show that the [employer's] proffered reasons were pretexual." *Gray v. City of Jacksonville, Fla.*, 492 Fed. Appx. 1, 4 (11th Cir. 2012).

In this case, for purposes of summary judgment only, Nicholas Financial does not dispute that Ms. Griffith is disabled and that she is a qualified individual within the meaning of the ADA. Instead, Nicholas Financial contends that Ms. Griffith cannot establish the "adverse action" element of her *prima facie* case. In

addition, Nicholas Financial argues that it has proffered a legitimate, nondiscriminatory reason for its acts and that Ms. Griffith cannot provide evidence to rebut Nicholas Financial's legitimate reasons.   The Court examines these arguments in turn.

### A. Adverse Employment Action

### 1. Admissibility of Nicholas Financial Management E-mails

As a preliminary matter, Ms. Griffith urges the Court to exclude e-mail correspondence among Kevin Bates, chief operating officer at Nicholas Financial, Mr. Hudgins, Ms. Adams, and Mr. Whitaker.  (Doc. 27, p. 12).  The e-mails are inadmissible hearsay if Nicholas Financial is offering them to prove that Ms. Griffith voluntarily resigned and was not terminated.  Fed. R. Evid. 801(c).  As a general rule, a district court cannot grant summary judgment on the basis of inadmissible hearsay.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012).  But under Rule 56(c)(2), a district court reviewing a motion for summary judgment may consider a hearsay statement "if the statement could be reduced to admissible evidence at trial or reduced to an admissible form," such as "hav[ing] the hearsay declarant testify directly to the matter at trial."  *Jones*, 683 F.3d at 1293 (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996).  And a hearsay statement is admissible if it is not offered for the truth of the matter asserted in the out-of-court statement.

Nicholas Financial argues that the e-mails show that on her last day with Nicholas Financial, Ms. Griffith was "merely being sent home for the day," and that Ms. Griffith "chose[] to end the employment relationship." (Doc. 22, pp. 25–30). At trial, the participants in the e-mail exchange—Mr. Bates, Mr. Hudgins, Ms. Adams, and Mr. Whitaker—can testify directly as to whether, in their view, Ms. Griffith was fired or resigned. In fact, sworn deposition testimony from Mr. Bates, Mr. Hudgins, Ms. Adams, and Mr. Whitaker is consistent with the explanation in the e-mails about the reason for Ms. Griffith's departure from the Huntsville branch office. *See Jones*, 683 F.3d at 1294. Consequently, the Court may consider the e-mails in this summary judgment opinion.

## 2. **Ms. Griffith's Departure from Nicholas Financial**

Nicholas Financial contends that Ms. Griffith did not suffer an adverse employment action because she voluntarily resigned. (Doc. 22, pp. 20–27). Nicholas Financial contends that when Ms. Adams told Ms. Griffith to get her things and leave, Ms. Adams was merely sending Ms. Griffith home for the day. (Doc. 22, pp. 24–26). Nicholas Financial adds that Ms. Griffith's "subjective belief" that she was being discharged when Ms. Adams told her to "get [her] shit and leave" was unreasonable as a matter of law. (Doc. 22, pp. 26–30). The Court disagrees.

An adverse employment action is one that a reasonable person would find causes a "serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001). The termination of a person's employment is the "classic and ultimate 'tangible employment action.'" *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 n. 18 (11th Cir. 1998) (citations omitted). In this circuit, whether an actual termination has occurred is a fact-intensive inquiry that focuses on the employer's intent and the "realities of the employee's situation." *See Thomas v. Dillard Dept. Stores, Inc.*, 116 F.3d 1432, 1434-35 (11th Cir. 1997) (internal marks omitted) (holding that a reasonable factfinder could conclude that the employee did not quit but was terminated). The termination analysis requires the Court to, "with close scrutiny," analyze "the employer's intent, which may be inferred not only from words but also from conduct, as well as the specific circumstances of the challenged job action." *Id*. at 1437.

In *Thomas*, an employee sued her former employer for age discrimination in violation of the Age Discrimination in Employment Act. 116 F.3d at 1432. The plaintiff's employer told her that she could not retain her position and offered her an alternative position. *Id*. at 1436. The plaintiff construed the employer's offer as insincere and took it to mean that she actually had been terminated. *Id*. at 1436. In finding that a jury should decide whether, after being demoted, Thomas had

voluntarily resigned or was terminated, the Eleventh Circuit relied on decisions of the former Fifth Circuit[9] and the Second[10] and Fourth[11] Circuits in discussing the standard for analyzing alleged termination scenarios. *Id.* at 1434–35. In the decisions that the Eleventh Circuit cited, the circuit courts of appeal considered whether the plaintiffs reasonably concluded that their employers had terminated their employment, taking into account all of the circumstances surrounding the employees' separation from the employers. *Id.*

For instance, in *N.L.R.B. v. Ridgeway Trucking Co.*, 622 F.2d 1222 (5th Cir. 1980), a decision that is binding on this Court, the Fifth Circuit had to decide whether the supervisor at a trucking company had terminated its striking workers when he told them, "if they were not going to go to work they should leave the property," and that "if they did not leave the premises, he would have to call the authorities." *Id.* at 1223. The Fifth Circuit held that "[t]he test of whether an employee was discharged depends upon the reasonable inference that the

---

[9] *See Payne v Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977) (holding that a termination has occurred when an employer "by acts or words, shows a clear intention to dispense with the services of an employee").

[10] *See Chertkova v. Connecticut General Life Ins.*, 92 F.3d 81, 88 (2d Cir. 1996) ("An actual discharge . . . occurs when the employer uses language or engages in conduct that 'would logically lead a prudent person to believe his tenure has been terminated.'") (citations omitted).

[11] *See EEOC v. Service News Co.*, 898 F.2d 958, 962 (4th Cir. 1990) ("No specific words need to be present to support a finding of actual discharge.").

employees could draw from the language used by the employer." *Id*. at 1224. (citations omitted). [12]

Nicholas Financial argues that e-mail correspondence among several members of its management establish as a matter of law that Nicholas Financial did not discharge Ms. Griffith. The argument fails. Viewing all of the evidence surrounding Ms. Griffith's departure from Nicholas Financial in the light most favorable to her, the Court concludes that a jury could find, based on Nicholas Financial's words and actions, that Ms. Griffith could reasonably conclude that Ms. Adams fired her. That evidence includes, among other things, Ms. Griffith's knowledge that the day before Ms. Adams told her to get her things and leave, Nicholas Financial interviewed applicants for her job and gave her a poor review. A jury must determine whether Nicholas Financial "used language or engage[d] in conduct that would logically lead a prudent person to believe" that she had been terminated. *Thomas*, 116 F.3d at 1434 (quoting *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir. 1996)) (internal marks omitted).

Nicholas Financial contends that Ms. Adams never explicitly told Ms. Griffith that she was fired, *see* doc. 22, p. 28, but "[a]n employer need not use the term 'fired' in order for a discharge to occur." *Ridgeway Trucking Co.*, at 1224;

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit that it handed down prior to the close of business on September 30, 1981.

see also *Thomas*, 116 F.3d at 1437 ("[T]he lack of specific words [*e.g.*, you are fired] is not dispositive) (alteration supplied) (citations omitted).    After Ms. Griffith left the branch, she considered herself discharged.  Ms. Griffith contacted Human Resources told them that she had been discharged and asked that her final pay check be separated from other monies that Nicholas Financial owed her.  (Doc. 20-1, pp. 42–43;  Doc. 20-6, p. 6).  Ms. Bootes testified that she believed that Ms. Adams had discharged Ms. Griffith.  (Doc. 20-6, p. 38); s*ee Ridgeway Trucking Co.*, 622 F.2d at 1224 ("[T]he evidence demonstrates that the employees considered themselves discharged. Their requests for paychecks and for removal of their belongings from the trucks indicate that the employees were under the impression that their services were no longer required by Ridgeway.").

Finally, Nicholas Financial did not designate "quit" as the reason for Ms. Griffith's separation of employment when Nicholas Financial responded to an inquiry from the Alabama Department of Labor.  (Doc. 20-6, pp. 6–8).  Instead, Nicholas Financial marked "lack of work" as the reason for her separation from the company.  (Doc. 20-6, pp. 6–8).

On this record, the Court cannot conclude as a matter of law that Ms. Griffith voluntarily quit. *See Ridgeway Trucking Co.*, 622 F.2d, at 1224 (noting that if the employer "truly believed that the employees were quitting," the employer's actions should have reflected that belief) (citing *Hale Manufacturing*

*Co., Inc.*, 228 N.L.R.B. 10 (1977), *enforced*, 570 F.2d 705 (8th Cir. 1978) (finding that an actual termination occurred where the employer did not regard the employee as fired).  Applying the *Thomas* standard to the facts of this case, and construing the evidence in the light most favorable to her, the Court finds that Ms. Griffith has presented sufficient evidence to raise a jury question as to whether she suffered an actual termination.

### B. Nicholas Financial's Legitimate, Non-Discriminatory Reason for Terminating Ms. Griffith

To articulate a legitimate, nondiscriminatory reason for discharging Ms. Griffith, Nicholas Financial does not have to "persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof."  *Gray v. City of Jacksonville, Fla.*, 492 Fed. Appx. 1, 7 (11th Cir. 2012) (internal quotation omitted).  Nicholas Financial submits that Ms. Griffith was an "insubordinate employee" with a "poor attitude who [did] not take criticism well." (Doc. 22, p. 31;  Doc. 20-5, pp. 20–22).  The record reflects that Ms. Adams and Mr. Whitaker had a number of conversations with Ms. Griffith about her attitude and about following instructions.  (Doc. 20-3, pp. 17–22;  Doc. 20-4, p. 14;  Doc. 20-7, pp. 7–13).  Because insubordination is a legitimate, nondiscriminatory basis for termination "that might motivate a reasonable employer," Nicholas Financial has met its "exceedingly light" burden.  *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*); Walker *v. NationsBank of Florida N.A.*, 53 F.3d

1548, 1556 (11th Cir. 1995); *Jarvis v. Siemens Med. Solutions USA, Inc.*, 460 Fed. Appx. 851, 857 (11th Cir. 2012) (recognizing insubordination as a legitimate, non-discriminatory reason for termination).

## C. Pretext

Because Nicholas Financial has articulated a legitimate reason for terminating Ms. Griffith, the burden shifts back to Ms. Griffith to show that Nicholas Financial's reason was a pretext for discriminatory conduct. Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotations and citations omitted). A plaintiff can prevail by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

The evidence viewed in the light most favorable to Ms. Griffith presents a jury question regarding pretext. *See Chapman*, 229 F.3d at 1024. The only intervening event between Ms. Griffith's "exceeds expectations" job evaluation on January 14, 2014, and her negative evaluation on January 29, 2014 was her

absence from work due to her unaccommodated disability.  (Doc. 20-6, p. 6). Nicholas Financial began interviewing people to replace Ms. Griffith approximately one month after Ms. Griffith complained to Nicholas Financial's human resources department about Mr. Whitaker's unwillingness to accommodate her request to remain at a desk that was poorly lit so that she could avoid a lupus flare.  The evidence shows that Nicholas Financial's vice president thought that Ms. Griffith was worthy of a promotion.  The individuals who made a 180 degree reversal in their assessment of Ms. Griffith decided, after Ms. Griffith missed work for two days due to her lupus, that she had a "bad attitude."  Viewed in the light most favorable to Ms. Griffith, this evidence presents "a convincing mosaic . . . that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks and citation omitted).  A jury could infer from this evidence that Nicholas Financial's asserted reasons for terminating Ms. Griffith are false, or, in the very least, should not be believed.[13]  From this evidence, a jury may infer that

---

[13] Nicholas Financial's reliance on *Lopez-Cruz v. FPV & Galindez*, PSC, 922 F. Supp.2d 255 (D. Puerto Rico 2013) is misplaced.  In that case, after the district court eliminated all of the plaintiff's other arguments, the district court held that an employer's contradictory reason for a plaintiff's separation of employment was, by itself, insufficient to reasonably infer that the employer was "cover[ing] up a discriminatory purpose, as stated in *Reeves*."  *Id.* at 238.  In reaching its conclusion, the district court noted that the plaintiff in *Reeves* offered far more substantial and specific evidence than the plaintiff in *Lopez-Cruz*.  *Id.* at 238.  In this case, Ms. Griffith has made a "showing that the proffered nondiscriminatory reason is false," and, like the plaintiff in *Reeves*, Ms. Griffith has provided evidence "that contradicts the explanation provided by the Defendant[]."  *Id.* at 238.

24

Nicholas Financial may be "cover[ing] up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).  Accordingly, the Court denies Nicholas Financial's motion for summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Nicholas Financial's motion for summary judgment.

**DONE** and **ORDERED** this September 30, 2016.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE